**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **JANE DOE,** | § | |
| | § | |
| | § | **CIV. A. NO. 6:19-cv-227** |
| *Plaintiff,* | § | |
| | § | **JURY DEMANDED** |
| **v.** | § | |
| | § | |
| **BAYLOR UNIVERSITY,** | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff JANE DOE[1] ("Plaintiff" or "Doe") files this Original Complaint against Defendant BAYLOR UNIVERSITY ("Baylor," the "University," or "Defendant"), and respectfully shows the Court the following:

### I.
### NATURE OF SUIT

Since 2014, Baylor has been embroiled in a national scandal involving its failures to protect women students from being sexually assaulted on its campus and its subsequent endangerment of those students who reported being sexually assaulted from further harm and retaliation. This is a civil action for monetary relief for injuries sustained by Doe as a result of the intentional acts and omissions of Baylor in violation of Title IX of the Education Amendments Act of 1972 ("Title IX") during the academic year 2017-2018 when Doe was sexually assaulted and exploited at the University. Doe asserts claims under Title IX based on liability arising both from Baylor's pre-assault conduct and its post-assault conduct.

---

[1] Plaintiff Jane Doe will file a Motion to Proceed Under a Pseudonym related to this Original Complaint and Jury Demand upon having the opportunity to confer with Defendant's counsel regarding the issue.

## II.
## PARTIES, JURISDICTION, AND VENUE

1.      During the academic year 2017-2018, Doe was a student at Baylor University in Waco, McClennan County, Texas, where she resided. Doe is now domiciled in another state.

2.      Baylor is a federally-funded institution of higher education located in Waco, McClennan County, Texas. Baylor may be served with process by serving President Linda Livingstone at Pat Neff Hall, Suite 100, Waco, Texas 76798.

3.      This Court has original jurisdiction to hear the merits of Doe's Title IX federal question claims under 28 U.S.C. §§ 1331 and 1343. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiff and Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      When Doe alleges that Baylor committed any act or omission, she means that Baylor's officers, directors, trustees, representatives, agents, servants, and/or employees committed the act or omission and that the Baylor officer, director, trustee, representative, agent, servant, and/or employee committed the act or omission in the course and scope of his or her employment with Baylor and with Baylor's full authorization, approval, and/or ratification.

5.      Baylor is located in Waco, McLennan County, Texas, and a substantial portion of the acts and omissions underlying Doe's claims occurred in Waco, McLennan County, Texas. Therefore, venue is proper in this district and division pursuant to 28 U.S.C. § 1391.

## III.
## FACTS

### A.  Baylor's Knowledge of the Risk of Sexual Assault on Campus

6.      Doe arrived at Baylor as a freshman in the fall of 2017. Despite Baylor's public pronouncements that it had remedied systemic problems of sexual assault and a sexually-hostile

education environment, Doe soon learned that Baylor remained a dangerous environment for women.

7.     As more specifically articulated below, in November 2017, Doe was sexually assaulted, and then stalked and threatened, by Baylor football players and another school athlete. When she reported these incidents to the University's Title IX Office, Doe was met with deliberate indifference and retaliation. Baylor's acts and omissions constitute systemic and calculated acts intending to insulate and protect the Baylor football program while wholly failing to fulfill its Title IX duties to a victim of sexual assault.

8.     The success of the Baylor football program is an overriding priority for Baylor administrators and donors. After losing every Big 12 Conference game on its schedule in 2007, Baylor poured considerable University resources into its football program, including the hiring of coach Art Briles.

9.     By 2011, Coach Briles had turned the Baylor program around. The team finished its season with a national bowl win, a Heisman trophy winner, and a Top 25 ranking. By the 2014 season, Baylor had built and opened the $266 million McClane Stadium. In the 2015 NCAA preseason rankings, Baylor was ranked fourth in the nation. It was a "new era" for the program.

10.     The newfound success of the football team had a sinister side, and Baylor's victories on the field came with a steep moral price. Players began to engage in rampant sexual misconduct and criminal behavior, behavior the coaching staff and University officials at the highest levels deliberately ignored and then covered up. By disregarding the safety of its female students in favor of star athletes, Baylor became a breeding ground for violence and sexual crimes against women, particularly by Baylor football players.

11.     Baylor's football player sexual assault problem first came to light with the 2012 arrest of starting linebacker Tevin Elliott for rape. Senior administrators and athletic personnel had known of Elliott's criminal conduct since October 2011, after he was cited for a misdemeanor sexual assault. Between November 2011 and his 2012 arrest, Elliott was accused of another assault. In all, Elliott is alleged to have sexually assaulted five Baylor students from 2009 to 2012, including a member of the equestrian team. Baylor had taken no steps to curtail Elliot's presence on campus during this time. Indeed, Elliot was allowed to remain on campus for almost a month after he was arrested. As reported by the *Wall Street Journal,* then President Kenneth Starr admitted to giving Elliott a "reprieve." Elliott was convicted on two counts of sexual assault in 2014 and sentenced to 20 years in prison.

12.     Baylor's tolerance of the sexual misconduct of its football players came to national awareness in June 2014 with a *Texas Monthly* article entitled "Silence at Baylor," after another football player, Sam Ukwuachu, was indicted in June 2014 for sexual assault of a Baylor soccer player. Baylor recruited Ukwuachu as a transfer from Idaho State despite red flags of possible criminal conduct, including alleged physical assaults on his girlfriend. In August 2015, Ukwuachu was convicted and sentenced to six months in prison and 10 years' probation. Before his conviction, Baylor had cleared Ukwuachu of any wrongdoing.

13.     Months after Ukwuachu was convicted in 2015, Baylor began investigating a 2013 incident of sexual assault alleged to have been committed against a member of the Baylor Bruins (the "Bruins")[2] by football players Tre'von Armstead and Myke Chatman. According to a Waco Police report, Baylor had been informed of the allegation when the incident occurred two years earlier. Baylor did nothing at the time in response to this report. In February 2016, three

---

[2] The Bruins were a group of attractive women students chosen to help recruit football players, referred to by the University as a "hostess" program.

years after the incident, Armstead was expelled from the University. Chatman already had left Baylor by the time of the investigation.

14.     Additional sexual assaults against Baylor women students by other Baylor athletes are alleged in multiple Title IX lawsuits against the University. These lawsuits include a complaint from a Baylor volleyball player who alleges she was drugged and gang-raped by Baylor football players in 2012.

15.     In November 2016, Baylor publicly disclosed that between 2011 and 2016, 17 victims made allegations of sexual assault or domestic violence against 19 football players; four of those assaults were alleged to have been gang rapes. At least one of the victims alleged the gang-rapes were a bonding experience for the football players and included the taking of photographs and videos.

16.     High-level University administrators and members of the Baylor Board of Regents were deliberately indifferent and hostile toward the sexual assault victims. Richard Willis is a past Baylor Regent who, from 2012 through 2016, was elected to an unprecedented four terms as Chair of the Board of Regents. He is the primary donor for, and namesake of, the Willis Family Equestrian Center at Baylor.

17.     Two of Willis's business associates have executed declarations under penalty of perjury indicting Willis's conduct, including that he had inappropriate and prejudicial attitudes about women and viewed them as sexual objects. The declarations are shocking in their recounting of Willis's crass and bigoted comments about both Baylor's African American football players and its female coeds. The declarations establish that Willis believed he had significant power at Baylor, which was corroborated by the fact that Baylor routed a majority of key decisions through Willis.

18.     Given the comments attributed to Willis, the benefactor of the equestrian facility, Plaintiff contends that Baylor deliberately housed her and her female equestrian team members in a building adjacent to the football team's apartments.

19.     Baylor's deliberate indifference toward its female students included a failure to institute a Title IX Office to oversee investigations of sexual harassment and sexual assault on its campus. Since 2004, federal law has required all educational institutions that receive federal funding to designate a Title IX Coordinator to oversee compliance with Title IX. Baylor did not hire a Title IX Coordinator until 2014, ten years after it was required to do so.

20.     In 2014, Baylor hired the Margolis Healy law firm to investigate its compliance with Title IX and the Clery Act (Violence Against Women Act). The investigators issued a final report (the "Margolis Healy Report") in November of that year. The findings of the Margolis Healy Report concluded that Baylor lacked any of the following: a functional Title IX program, an integrated and unified Title IX policy, appropriate sexual assault prevention measures, a system to document that it provided victims notice of their rights to contact law enforcement, and an experienced Title IX investigator. The Margolis Healy Report also found that Baylor had not "owned" its sexual assault reporting responsibilities under federal law. It did not have police officers trained about sexual crimes, did not have a unified reporting system, and did not have properly trained "Campus Security Authorities." In fact, the people on campus who Baylor identified as Campus Security Authorities had either not been notified of their roles or were not able to articulate their responsibilities.[3]

21.     Notably, the Margolis Healy Report found that Baylor evidenced "significant resistance towards implementing proper federal government-mandated interim measures (e.g.,

---

[3] Despite multiple sexual assault complaints being filed during the time period, Baylor reported to the U.S. Department of Education that no assaults had taken place between 2008 and 2011.

changes in academic, residential, working, or transportation arrangements [to protect complainants] that would adversely affect respondents while an investigation is underway"). In other words, Baylor had refused to protect victims of assault during the pendency of Title IX investigations, in violation of federal mandates.

22.     Baylor responded to the Margolis Healy Report by hiring Patty Crawford, Baylor's first Title IX Coordinator, in November 2014. After hiring Crawford, however, Baylor underfinanced, understaffed, undercut, and sabotaged the workings and proper functioning of the Title IX Office. Citing Baylor's failure to support the work of the Title IX Office and campus-wide retaliation against her for attempting to move Baylor toward compliance, Crawford resigned her position in October 2016 and filed a complaint with the U.S. Department of Education.

23.     By summer of 2015, the publicity surrounding the rapes by Elliott and Ukwuachu forced Baylor to take additional public action. The Regents commissioned lawyers from the Pepper Hamilton law firm to conduct another investigation. This time, the lawyers were directed to investigate the University's institutional response to Title IX and related compliance issues "through the lens of specific cases." In May 2016, the Baylor University Report of External and Independent Review (the "Pepper Hamilton Report") and the Baylor University Board of Regents Findings of Fact ("Findings of Fact") were released to the public. The Pepper Hamilton Report included 105 recommendations for action by Baylor to remedy its continuing failure to maintain an environment where female students were safe from sexual assault and harassment.

24.     The Regents' Findings of Fact are a devastating self-indictment. They include that Baylor "failed to effectively" implement Title IX, failed to institute student processes that were timely or effective, failed to provide equitable responses to complaints, failed to support

complainants "through the provision of interim measures," and failed to "take action to identify and eliminate a potential hostile environment" or to "address its effects" for individuals or the community.

25.     In response to the Pepper Hamilton Report, the Regents terminated President Starr and Coach Briles.  Athletic Director Ian McGraw resigned under pressure.

26.     On March 1, 2017, the Texas Rangers (Texas Department of Public Safety) announced that it had opened an investigation into Baylor's alleged mishandling of sexual assault reports. That investigation is ongoing.

27.     On May 26, 2017, two months after the Texas Rangers began their investigation, Baylor announced "the structural completion of the implementation of the 105 Recommendations" and that the longstanding and deep-seated University-wide Title IX problems were substantially behind it. It announced that the Title IX Office, policies, and process had been revamped, and that future complainants would now "experience a consistent and equitable policy that addresses sexual and gender-based harassment and violence, dating violence, domestic violence and stalking."

28.     As she was preparing to leave for Baylor in summer 2017, Jane Doe and her family took the University's assurances to heart. Doe laughed when her friends at home jokingly warned her as she left for Waco: "Don't get raped by Baylor football players."

29.     Tragically for Doe, the University's Title IX problems had not miraculously vanished overnight. The Regents' assurances were words only; indeed, they turned into another form of Baylor's deliberate indifference to the ongoing sexual assault problem on its campus.

30.     In October 2018, the NCAA announced findings from its own independent investigation: Baylor lacked "institutional control" over the football program.

31.     The Big 12 also initiated a comprehensive investigation of Baylor's athletics and Title IX compliance, specifically seeking to determine whether Baylor had violated Big 12 Bylaws and whether it had accomplished the 105 recommendations from the Pepper Hamilton Report. The Big 12 Board of Directors, in a supermajority decision, issued sanctions against Baylor and required specific remedial action to address its Title IX failures. The Conference withheld 25% of its payments to Baylor until it could verify that Baylor, among other requirements, complied with Title IX. It also fined Baylor $2 million for damaging the conference's reputation.

32.     On August 31, 2018, The Big 12 issued its Report on Verification of Implementation of 105 Recommendations by Baylor University (the "Big 12 Report"). Although its overall assessment was that Baylor was moving in a positive direction, the Big 12 Report documents a shocking amount of disarray still occurring in Baylor's Title IX Office, particularly at the time of Doe's assault and her corresponding Title IX complaint. It describes the Title IX Office in a "state of flux" throughout the time of the "investigation" of Doe's complaints. For instance, for a time, all positions under the Title IX Coordinator reported to individuals outside of the Title IX Office, not the Coordinator. Additionally, Baylor was only able to supply "verbal assurances" that its Title IX Office was properly staffed and independent as required by Title IX.

33.     The Big 12 Report also states that during 2017-2018 (the timeframe when Doe filed her Title IX complaint at Baylor), the Office "ran contrary to Title IX's regulatory mandate." The Big 12 Report further noted that although every school under Title IX must designate an employee as its Title IX Coordinator, Baylor had contracted with an outside law firm to have one of its attorneys, Maureen Holland, act as Interim Title IX Coordinator. Holland

was not a trained Title IX coordinator; moreover, she lived in Philadelphia at the time and was only on campus three days a week.

34.     Despite all the problems, complaints, and negative publicity it had received, Baylor did not have its own full-time Title IX Coordinator until June 2018. By this time, Doe had left Baylor for good. Moreover, two other important positions, a full-time Title IX Investigator and a full-time Title IX Administrative Assistant, remained vacant. Although the positions are essential to any functioning Title IX Office, Baylor continued to leave them empty.

35.     In choosing to attend Baylor, Doe relied on Baylor's numerous public statements and assurances that the University's sexual assault problem was in its past. She relied on Baylor's admissions materials, its web site, and the words of those who personally recruited her that Baylor was safe and committed to protecting her against sexual assault.

36.     Doe enrolled at Baylor in August 2017. She was sexually assaulted approximately three months later in November 2017.

37.     Despite the ongoing national scandal, the Margolis Healy Report, the Pepper Hamilton Report, and ongoing investigations by the U.S. Department of Education, the Texas Rangers, the NCAA, and the Big 12, Baylor wholly failed to implement and abide by its clear responsibilities under Title IX. This failure led to the harm experienced by Doe when she attended Baylor in 2017-2018.

## B.  The Underlying Sexual Assault

38.     Doe decided to attend Baylor after she and her family had conducted an exhaustive college search. She was an honors student in high school with a 4.47 grade point average and success in numerous AP classes. Doe was seeking a college with rigorous academic programs, especially in the sciences, so she could pursue her dream of becoming a veterinarian.

She also was looking for a college that would further her goals of competing on a Division I equestrian team, as she was an accomplished rider and had competed nationally.

39.     When Doe arrived on Baylor's campus in August 2017, she was delighted to be there. She enthusiastically began her studies and was thrilled to be a part of the Equestrian Team. Doe liked the campus and had started to make many new friends. Her first few months at Baylor were very happy and she was glad she had made the choice to become part of "Baylor Nation."

40.     The happiness and excitement came to an end, however, on November 11-12, 2017. On that Saturday evening, Doe attended a post-football game gathering at the Baylor-owned University Park apartment of four equestrian team members, including Respondent 4.[4] She and her friends wanted to celebrate the end of the equestrian season. Several football players were present, including Respondent 3. Doe drank vodka and other alcoholic beverages from approximately 9:30 p.m. until 11:30 p.m. and became intoxicated. She later told Title IX investigators: "I knew I was drunk…I think I felt pretty intoxicated for a while." Doe also told the investigators that she had drunk more that evening than was normal for her.

41.     At approximately 11:30 p.m., Respondent 4 drove a group of women (including Doe) along with Respondent 1, to Scruffy Murphy's bar in Waco. There they spent several hours dancing. Respondent 2 was at the bar when they arrived, and Respondent 3 arrived later. Witnesses told investigators that Doe and her friends seemed intoxicated at the bar.

42.     When the group decided to leave the bar, Respondent 4 drove all the women and Respondent 3 back to Respondent 4's apartment, which she shared with three other women. Doe and her friends exhibited clear signs of being incapacitated on the way to the car and to the apartment. Doe was stumbling and had trouble speaking.

---

[4] Doe's Complaint refers to the individuals who sexually assaulted and exploited her by the "Respondent" number assigned to each individual during the Baylor Title IX investigation. In the investigation, Doe was identified as "Complainant 3."

43.     After they arrived at the apartment, Respondent 3 left temporarily to go to his own apartment to take a shower. On the way back to the women's apartment, he met up with Respondent 2 and invited him to the women's apartment.

44.     At the apartment, Respondent 2 and Respondent 3 sexually assaulted Doe and one of her friends while the women were incapacitated from the alcohol they had consumed.

45.     Respondent 1 was present at the apartment during the assault. He recorded five or six videotapes on his phone of the sexual activity that included Doe and two other victims. He posted one or more of the videos on a freshman football Snapchat group and he sent some of the videos to friends back home. He also sent copies of the videos to Respondent 4, who had not been present at the apartment during the sexual activity. She showed the videotapes of Doe and the others to numerous people including multiple equestrian team members.

46.     Doe spent the night in one of her friend's beds at the apartment because she was too intoxicated to walk to her own apartment in a nearby building.

47.     When Doe woke up the next morning, she talked with several of the people who had been at the gathering. By this time, both Respondent 1 and Respondent 4 had been distributing and showing the videos to numerous people on campus.

48.     By Sunday evening, Doe had learned of the videos. Upper-class equestrian team members who had heard about and/or seen the videos blamed Doe and the other women for the assaults. The teammates called them "sluts" and told them they deserved to be kicked off the team for making them look bad. Doe became fearful that she would be disciplined by her coach, Casie Maxwell. None of her teammates, except Respondent 4, was ever disciplined by Baylor for their retaliation against Doe.

49.     By Tuesday, November 14, Doe began to understand that she had been the victim of a sexual assault. She told Coach Maxwell what had happened, and Coach Maxwell encouraged Doe to speak with Baylor's Title IX office. Doe made an appointment with Title IX for Wednesday, November 15.

50.     Before she could attend the meeting with Title IX, Respondent 4 told Doe that if she reported the assaults, her name would be publicized nationwide and Baylor football would "receive the death penalty." Doe was extremely intimidated by these threats; and she agreed, for a short time, not to make the report to Title IX.

### C. **Doe's Report to Baylor's Title IX Office**

51.     Despite the threats from her teammates, Doe decided to move forward with a formal complaint to the Title IX office. She made her report on November 16, four days after being assaulted. Unbeknownst to Doe, on November 15, Holland (the Interim Title IX Coordinator) and Baylor Associate General Counsel Lisa Turner had already been advised of the events on the night in question and that videos of sexual activity had been taken and circulated. Despite this knowledge, Baylor took no steps to implement interim measures to protect Doe from her assailants. At the same time, Baylor postponed initial witness interviews for two full weeks.

52.     Michael Noble, a former police officer, and Lee Ann James were assigned by the Title IX office to investigate Doe's complaint. Doe was first interviewed on November 30, 2017. The Title IX office did not issue a Notice of Investigation until January 18, 2018—more than two months after Doe had made her initial report. Doe was interviewed again on March 14, 2018, and once again (at her own request) at the end of April 2018.

53.     Although federal regulations and Baylor's own policies require the University to complete an investigation of a complaint of sexual assault within 60 days, Baylor's Title IX

Office did not complete the investigation and discipline process until over a year later in February 2019.  By that time,  all three of the victims and all four of the assailants had left Baylor permanently.

**D.  Baylor's Delayed and Insufficient Title IX Process**

54.     Baylor's delays in investigating Doe's Title IX complaint caused Doe heightened anxiety. When she returned to campus after Christmas break to start the spring semester, she did not know whether Baylor would be taking any action to protect her from her assailants or otherwise address her complaint.

55.     In addition to failing to meet investigation deadlines, Baylor's Title IX investigators failed in their role as neutrals in the investigative process. Title IX interviews are to gather pertinent, factual information from relevant parties and witnesses and to allow a complaining party "the opportunity to provide [her] perspective of the incident and to ask any questions [she] may have."

56.     Investigators Noble and James did not follow this required protocol. Instead, they conducted Doe's November 2018 and March 2019 interviews as if she had been accused of wrongdoing. Noble, in particular, "interviewed" Doe in a shaming, embarrassing, and hostile manner. He probed for graphic details of her assaults, including asking about the size of one man's penis and asking her to describe in minute detail where she had been touched and how it felt. This interrogation forced Doe to relive the trauma.

57.     Noble also attempted to elicit admissions of consent from Doe despite her repeated assertions that she was incapacitated. He questioned her harshly and confusingly, in the manner of a police interrogation. In a textbook victim-shaming maneuver, he went so far as to ask her what she was wearing that night.

58.     Doe left the Title IX interviews feeling confused, anxious, depressed, and sensing that she was not believed by Noble and James. She fell apart emotionally and physically and her grades began to suffer.

59.     Baylor's *Sexual and Gender-Based Harassment and Interpersonal Violence Policy* (the "Policy") describes "consent" as "the voluntary, informed, and freely given agreement, through words and/or actions, to participate in mutually agreed-upon sexual acts." Further, Baylor has adopted an "affirmative consent" rule requiring "each partner [to] willingly and affirmatively choose[] to participate." The Policy specifically states that "[c]onsent cannot be inferred from silence, passivity, or lack of resistance...."

60.     Doe told the investigators throughout the questioning that she had been incapacitated and that she was too intoxicated to be able to give consent to sexual activity, but that she remembered telling both men to stop. Other witnesses confirmed Doe's account of her incapacity.[5] Despite this witness agreement, Noble repeatedly attempted to make Doe admit that she had consented to the sexual activity. He even told her that she had admitted previously that she had consented, which was not true.

61.     When Doe told Noble that she had told one of her assailants to "stop," Noble questioned whether she said "no" forcefully enough: "Do you think though from. . . [his] perspective, he took it as stop don't ever do that again?"

62.     During the second, March 2018 interview, Noble and James attempted to have Doe say that she told people that she was raped only because she was embarrassed that the incident had been videotaped. While Doe repeatedly communicated that she was incapacitated and did not give consent—to the sexual activity or the videotaping—the investigators

---

[5] Multiple witnesses testified that Doe was "off the charts drunk," "more intoxicated than I had ever seen [her]," and "stumbling quite a bit."

manipulated her words and her mental state to try to get Doe to affirm that she consented to some of the acts.

63.     After the second interview, Doe thought the Title IX investigators had concluded that she was lying to them. She asked for a third interview. On April 16, 2018, Doe gave her third interview and she provided a signed statement to the investigators.

64.     In their Final Investigative Report, despite other witnesses' statements as to Doe's "off the charts" inebriation, Noble and James concluded that Doe was not intoxicated *enough* under Baylor's Policy to determine that either football player, Respondent 2 or Respondent 3, had assaulted her on that basis.

65.     When Doe returned to campus for the spring of 2018, she had been informed of only one interim measure instituted by Baylor against her assailants: no contact orders ("NCOs"), which had been implemented a few weeks after her complaint.

66.     Doe knew that the NCOs were bound to fail. She lived within yards of the football player's apartments. She ate in the athletes-only dining hall with the men, trained in facilities shared by the football team, and studied at the academic support program for all athletes.

67.     As Doe expected, the NCOs were not enforced by Baylor, and they were routinely ignored by the men. For example, in December 2017, Respondent 1 followed Doe into the Baylor Student Union and sat near her and two students with whom she was studying. When she left to escape him, he followed her outside. She was terrified and reported the incident to Title IX on the same day. Respondent 1 received no punishment for violating his NCO. He received only a mild rebuke and a reminder about the NCO.

68.     The only other sanctions against the men of which Doe was made aware were minor, and they did not protect Doe. With two games left in the season, the football player

assailants allegedly were "separated" from the football team pending the investigation into Doe's complaint. Despite the "separation" from the team, however, the players were allowed to stay in their University apartments. Doe saw them and their cars in the apartment parking lot repeatedly, and she was frightened that her assailants might harm her again.

69.     The players also were allowed to continue receiving tutoring in the Baylor athletes-only tutoring facility ("Highers"), where Doe also attended tutoring sessions. Doe pointed out to the Title IX office that she regularly saw the men at Highers, and she asked that they not be allowed in the facility. Baylor did not grant her that accommodation. Doe saw the football players there more than once, and it terrified her. On one occasion, she hid and then ran out of the building after seeing one of them. Eventually, the Title IX Office took some steps to address this issue by establishing a schedule for Doe to attend tutoring. The hours Doe was allowed to attend tutoring were cut to only two hours in the facility per week. On the other hand, the men were allowed multiple hours of tutoring every day.

70.     Baylor also allowed the football players to continue to eat in the athletes-only dining hall despite Doe's request that they be banned. When Baylor did not ban them, the men sat near her and stared at her, despite being ordered to have no contact with Doe.

71.     Baylor eventually addressed the dining hall problem by prohibiting Doe from eating at the dining hall at any time except after 6:00 p.m. The players violated even this protection with impunity. Respondent 1 showed up in the dining hall after 6:00 p.m. while Doe was eating dinner. He was only disallowed from eating in the dining hall after a time-stamped photo of him there after hours was submitted to the Title IX Office.

72.     As the investigation wore on, Baylor violated Doe's privacy in numerous ways. The investigators unnecessarily questioned 39 people—most of whom were not direct witnesses

to any part of the evening—including some of Doe's friends who did not know about the assault prior to being questioned. The investigators showed the videos to many of the people they interviewed, and they revealed her name to witnesses who did not know who she was or who did not know that she was the person making the Title IX complaint.

73.     In addition, Baylor violated Doe's privacy by prompting national news stories, including football coach Matt Ruhle's announcement of the "suspension" of the football players because of sexual assaults on "equestrian team members" on Media Day in spring 2018. National media were also allowed access to the equestrian barn and team-only facility, and information about a private equestrian team meeting about the assaults was leaked to the press. The leak was never investigated by Baylor. When Doe requested that Baylor protect her from the media during the Title IX process, Holland stated that Baylor needed to be transparent with the media due to its past transgressions.

74.     Baylor also refused to assist and support Doe's psychological needs after the assault. Doe made repeated requests of the Baylor Campus Counseling office to meet with a counselor specializing in work with sexual assault victims. When the first counselor was not helpful, she asked Title IX for further assistance. The Counseling and Title IX Office failed to follow up and ensure she was getting counseling despite Doe's disclosure that she was experiencing nightmares, panic attacks, and depression because of the assaults, and she was expressly asking for help.

75.     Doe began having severe physical and emotional reactions to seeing the assailants on campus and to anticipating seeing them near her apartment building. She was not able to sleep; she found it hard to study; she could not concentrate; and she became fearful even to leave her apartment. Doe made one of her reports to the Title IX Office that the men were violating

their NCOs in March 2018. On March 27, 2018, Holland promised that the entire investigation would be "wrapped up" in a few weeks.

76.     In early April 2018, Doe made a reasonable formal request that the men be removed from campus until the investigation was completed. Baylor refused her request, but improperly offered to adjust *her* class schedule and not the men's.

**E.  Baylor's Deliberate Indifference and Retaliation in Response to Doe's Complaint**

77.     On April 5, 2018 Doe's counsel sent a letter to Holland (on which President Linda Livingstone was copied), detailing the problems with the ongoing Title IX investigation, providing examples of investigator Noble's harassing interrogation tactics, and requesting that the process be brought to an end. It had been five months since Doe had made her initial, formal report to Title IX. Baylor's response was dismissive: "[T]he Title IX process will continue as set forth in Baylor's policy." Contrary to this response, Baylor's policy required that the process have been completed three months prior.

78.     On May 11, 2018, Doe's father wrote a letter to President Livingstone, telling her how Doe had carefully chosen Baylor and was delighted to be a member of the equestrian team. He expressed that before Doe accepted Baylor's offer of admission, he and Doe's mother had been "deeply troubled" and had "fears about [Baylor's] athletic program, sexual assaults and the widely reported failings of the institution in supporting victims." He told Livingstone that they "wanted to believe that the new football and equestrian programs would make it a safe place for…[Doe]."

79.     Doe's father's letter provided details to President Livingstone of Baylor's deliberate indifference toward Doe's complaints and safety, including the excessive time for the investigation to be completed, the interviewers' resistance to believing Doe's story, the

interviewers attempted coercion of Doe to admit consent to the sexual assault, Baylor's allowing public media to be present on campus to report on the sexual abuse scandal surrounding Doe's complaint, Baylor's punishing Doe by reducing the hours she was allowed to be present in the athletes-only dining hall and tutoring sessions, and Baylor's not removing the perpetrators from the campus during the entire school year. The letter concluded with the observation: "Baylor's adoption of written policies and procedures as part of addressing its past transgressions in Title IX matters has in practice simply shifted the abuse of victims to a fully institutionalized process."

80.   President Livingstone's June 1, 2018, response to Doe's father's heartfelt letter was mostly denial: "I was truly disheartened to read your letter, as it does not reflect the values of Baylor nor the significant improvements we have made over the past few years in the training, prevention and management of instances of interpersonal and sexual violence within our campus community." It offers her "thoughts and prayers" for Doe.

81.   When Baylor had not finished the investigation process in the middle of summer 2018, Doe was compelled to leave Baylor for her health and safety, even before she had been admitted to another school. Doe was in such deep psychological distress about the possibility of facing her assailants again that she gave up her academic scholarship at Baylor and the dream she was living of participating on a Division I equestrian team.

82.    In her letter of withdrawal to President Livingstone, Doe wrote: "I have been effectively forced out of Baylor due to how I have been treated by the university itself and the people that attend it. I have been robbed of my right to an education, an athletic career, and my mental wellbeing. While the assault itself torments my mind, the actions of the Title IX office and those around me worsened my mental state and are a large part of my continued struggle today."

83.     On Wednesday, October 18, 2018, Doe was finally notified of the outcome of the investigation and the sanctions issued against the assailants—almost a full year after her assault and four and a half months after she had left Baylor. Respondent 3 was found to have assaulted Doe because he ignored her pleas to stop. He was expelled. Respondent 1 was found to have sexually exploited Doe. He was banned from Baylor's campus and functions. Despite the fact that Doe did not consent to sexual activity with him, Respondent 2 was found not to have violated Baylor's sexual misconduct policies, and he was not disciplined for sexual assault of Doe.

84.     No decision was rendered for Respondent 4 because Baylor inexplicably stopped investigating her conduct after Respondent 4 voluntarily withdrew from the University. In January 2019, the Title IX Office re-opened the case against Respondent 4 because she wanted to re-enroll, forcing Doe to relive these events for yet another time. Ultimately, Respondent 4 was found responsible for sexual exploitation and retaliation against Doe and barred from campus.

## IV.
## CLAIMS

### COUNT 1 – Title IX Violations

85.     Doe incorporates by reference each of the paragraphs recited above.

86.     Baylor's actions and omissions constitute unlawful discrimination against Doe in violation of her rights under Title IX to receive an education in a non-sexually hostile environment. Among other actions, Baylor made Doe vulnerable to an unsafe and discriminatory environment by the adoption and then the continuance of an official policy of condoning sexual assaults and exploitation by Baylor football players. These official policies unreasonably subjected Doe to a heightened risk of sexual assault.

87.     Baylor also violated Doe's rights under Title IX because it had an official policy of hiring unqualified Title IX investigators and condoning the harassment and intimidation of sexual assault victims by such investigators, which constitutes intentional discrimination. Baylor also did not train its investigators relating to standards for "consent" under Baylor's Policy and under Texas law, as well as the necessity of not violating victims' privacy. Such training was necessary to implement proper and effective Title IX policies and procedures.

88.     Baylor also violated Doe's rights under Title IX because in 2017-2018, despite multiple ongoing investigations of its Title IX operations, it had an official policy of failing to properly staff and support its Title IX Office with appropriately-trained investigators and a full-time Title IX Coordinator who was an employee of Baylor. The Title IX staff that was there were not properly trained on the necessity of non-retaliatory interim measures to protect sexual assault victims and the need for a media policy that protected victims from exposure. Such staffing, support, and training were necessary to implement proper and effective Title IX policies and procedures.

89.     In fact, at the time of Doe's assault, Baylor's Title IX Office had an official policy of implementing interim measures that were adverse to complaining victims, not respondents. Even though this policy was expressly condemned by the 2014 Margolis Healy Report, Baylor deliberately refused to cure this deficiency in its Title IX policies and procedures.

90.     Baylor also violated Doe's rights under Title IX because it had an official policy of failing to train its police department and "Campus Security Authorities" to do sexual assault prevention activities, crime reporting, and/or investigations, which constitutes intentional discrimination. Such training was necessary to implement a proper and effective Title IX policies and procedures.

91.     Baylor also violated Doe's rights under Title IX because it had an official policy of failing to train its Athletic Department personnel regarding sexual assault and exploitation (especially related to issues of consent and alcohol and drug intoxication). Further, it did not train Athletic Department personnel to enforce NCOs or anti-retaliation policies or to maintain privacy for the victims, especially from media exposure. Such training was necessary to implement proper and effective Title IX policies and procedures.

92.     Baylor further violated Doe's rights under Title IX because numerous officials and responsible authorities had actual knowledge that Doe had been sexually assaulted by two football players and sexually exploited by another football player and a member of the Equestrian Team but responded with deliberate indifference and retaliation to this knowledge. Baylor's deliberate indifference and retaliation includes, but is in no way limited to, the University's strategic delay imposed in the Title IX process, the abusive interrogation tactics of the Title IX investigators, the purposeful implementation of adverse interim measures against Doe, the disclosure that Doe was a member of the Equestrian Team to the media, and the blatant disregard for Doe's privacy in the form of needlessly revealing her name and showing the sexually exploitative videos to peers during the Title IX process.

93.     Baylor's deliberate indifference and inaction to stop retaliation by the assailants made Doe vulnerable to further abuse by the football players, including stalking and other threatening behaviors, and actually caused her to suffer further abuse, up to the day she left Baylor's campus in May 2018.

94.     The abuse Doe suffered from the four Respondents who assaulted and exploited her was severe, pervasive, and objectively offensive in light of the circumstances and it created a

hostile educational environment at Baylor that deprived Doe of access to the educational opportunities and benefits at Baylor that were her right under Title IX.

95.     Doe is entitled to be made whole for all damage to her caused by Baylor's discrimination against her. She also seeks equitable relief necessary to return her to the position that she would have held absent Baylor's unlawful discrimination.

96.     Baylor's discrimination caused Doe to suffer, and she expects to continue to suffer, pecuniary losses, which include: costs for relocating away from Waco, medical and counseling costs, costs associated with transferring to a university closer to her family home with higher tuition and fees and housing expenses, and loss of her academic scholarship at Baylor. Doe seeks to recover these actual damages.

97.     As a further result of Baylor's discrimination, Doe has suffered and continues to suffer non-pecuniary losses, including, among others: intense emotional pain relating to her sexual assault, sexual exploitation, and retaliation and Baylor's discriminatory treatment of her, undue stress, anxiety, anguish, loss of enjoyment of life, physical pain, and feelings of re-victimization by Baylor, as well as other non-pecuniary damages. Accordingly, Doe seeks compensatory damages.

98.     Baylor's discrimination required Doe to retain the undersigned counsel in order to redress the harm done to her by Baylor. Consequently, Doe seeks attorneys' fees. She also seeks to recover expert costs and other litigation expenses.

## V.
## JURY DEMAND

99.     Doe requests a jury trial on all issues, claims, actions, and defenses in this case.

# VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JANE DOE prays that Defendant BAYLOR UNIVERSITY be summoned to appear and answer, and that on final trial, judgment be granted against Baylor for:

   a.   A declaration that Baylor's actions violated federal law;

   b.   Equitable relief necessary to place Doe in the position that she would have held but for Baylor's discrimination and retaliation against her;

   c.   Actual and compensatory damages;

   d.   Prejudgment and post-judgment interest;

   e.   Attorneys' fees, expert fees, and costs of suit;

   f.   Other legal and equitable relief to which Doe may justly be entitled.

Dated:  March 27, 2019                    Respectfully submitted,

FARROW-GILLESPIE HEATH WITTER, LLP

By:_____
   Julie E. Heath
   Texas Bar No. 09348050
   Patricia H. Davis
   Texas Bar No. 24036449
   Katie M. Ackels
   Texas Bar No. 24078948
   1700 Pacific Avenue, Suite 3700
   Dallas, Texas 75201
   Tel: (214) 560-5600
   Fax: (214) 203-0651
   julie.heath@fghwlaw.com
   patricia.davis@fghwlaw.com
   katie.ackels@fghwlaw.com

**ATTORNEYS FOR PLAINTIFF JANE DOE**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 27, 2019, I served the foregoing on the following counsel of record via electronic mail and certified mail, return receipt requested:

Julie A. Springer
Weisbart Springer Hayes, LLP
212 Lavaca Street, Suite 200
Austin, TX 78701
JSpringer@WSHLLP.com

/s/ *Julie E. Heath*
Julie E. Heath