# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **MARY DOE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 6:19-cv-00227-RP** |
| | § | |
| **BAYLOR UNIVERSITY,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT BAYLOR UNIVERSITY'S ORIGINAL ANSWER
## AND JURY DEMAND

TO THE HONORABLE JUDGE PITMAN:

Defendant Baylor University ("Baylor") files its Original Answer to Plaintiff's Original Complaint and Jury Demand [ECF 14] ("Plaintiff's Complaint").

## I.
## NATURE OF SUIT

Nothing is more important to Baylor than providing a safe and caring environment for its students. Sadly, however, and despite Baylor's best efforts—efforts that led the Big 12 Conference to find that "those in Baylor's Athletics Department are among the most informed and empowered to prevent . . . and to respond appropriately to" sexual assault—Baylor cannot eradicate all sexual assault, which is a societal problem affecting colleges and universities nationwide. But Baylor did not cause Plaintiff's alleged assault, and it did not respond in a deliberately indifferent manner. Baylor denies the allegations in the Nature of Suit paragraph of Plaintiff's Complaint.

Despite Plaintiff's statement that this is a civil action seeking monetary relief for alleged acts and omissions "during the academic year 2017-2018," when her alleged assault occurred, Plaintiff's

Complaint focuses almost exclusively on football-related events that transpired prior to May 2016—and during a time when Baylor had a different President, a different Athletic Director, and different head football coach. As Plaintiff notes in her Complaint, all three of those individuals were removed from their positions shortly after the conclusion of the Pepper Hamilton investigation in May 2016. Baylor subsequently hired a new President, a new Athletic Director, and a new head football coach.

Under the new Athletic Director, hired on July 18, 2016, significant personnel actions ensued, including a turnover, by the fall of 2017, of approximately 90 employees within Athletics. In addition, under the new football coach, hired on December 7, 2016, almost the entire football staff turned over. Importantly, since his hire, the new Athletic Director has made a practice of meeting with all coaches, non-coaching staff, and student-athletes from each team to reinforce the expectation of a culture of high moral standards, enforcement, and discipline. This includes a fierce commitment to following recommended Title IX policies, guidelines and best practices, including engaging in appropriate training and education to student-athletes on the issue of sexual assault. It was against the backdrop of this new Athletics and football administration that the student-athletes involved in this incident, including Plaintiff and her alleged assailants, arrived at Baylor.

In addition to the new Athletics and football staff, significant Title IX education and training programs were in place for all students when Plaintiff and her fellow student-athletes arrived on campus in the fall of 2017. By way of example only, all incoming students were required to complete an on-line Title IX training course and an in-person training event prior to or during their first semester at Baylor. Students who did not complete the training by the end of their first semester would have a hold placed on their account and would not be allowed to register for the spring semester until the training was complete. Also, during the first week of classes each fall semester, the Title IX Office, in coordination with several other departments, hosts a mandatory-attendance event for all first-time undergraduate enrollees called "It's On Us Baylor." The program includes speakers on

topics such as consent, bystander intervention, reporting methods and respect for others.  Attendance is monitored electronically.  In the fall of 2017, every new student, including Plaintiff and the other students involved in this incident, would have attended the event.

In addition to the general training for all students described above, in August 2017 all student-athletes also participated in a two-part interactive workshop on sexual- and gender-violence prevention that, among other issues, addressed the issues of consent and the role alcohol and drugs often play in sexual-violence incidents.  Like student-athletes, Athletics staff, including the entire football staff, also receive extensive Title IX training.

Plaintiff's Complaint buries the results of Baylor's Title IX investigation, but the truth is that all four student-athletes named as respondents in the Title IX proceeding—including the two football players Plaintiff claims assaulted her, the football player who took and shared videos of Plaintiff kissing people before the alleged assault, and a female athlete who also shared those videos—have been banned from Baylor's campus.[1]  The same day that Athletics officials learned about the incident, they reported the matter to Baylor's Title IX Office.  Within 36 hours of the incident report, all three football players were suspended from all team activities.  None ever played a down for Baylor football.

The bottom line is that Plaintiff's assertion—that Baylor had "an official policy of condoning sexual assaults and exploitation by" its current football team—is not grounded in the reality of what was happening on campus in the fall of 2017.  Rather, it is an attempt to manufacture a theory of liability based on highly publicized and historical problems of a completely different Athletics Department and football team under completely different leadership.  The truth is much different: as the Big 12 Conference found, "Baylor's Athletics leadership now coordinates its education programs with the Baylor Title IX Office and others on campus to supplement, enhance, and build on Baylor's

---

[1] One of the football players was found not responsible for Plaintiff's alleged assault but was found responsible for related conduct.

existing Title IX education campaign to ensure that those in Baylor's Athletics Department are among the most informed and empowered to prevent (including bystander interventions), and to respond appropriately to, instances of sexual and gender harassment, violence, and other forms of serious misconduct."[2]  The Big 12 also found that "While many of the student-athlete misconduct policies and procedures that have been implemented in and around Athletics far exceed those found at peer institutions, Baylor's Athletics Department coaches have embraced these changes." *Id.* at 45. Plaintiff's assertions based on a general culture in the football team lack merit.

Baylor's significant efforts—both in its football program and campus-wide—in no way equate with an institutional intent to subject female students to harm or deliberate indifference.  The University neither caused Plaintiff's alleged assault nor responded in a deliberately indifferent manner. Baylor denies Plaintiff's allegations.

## II.
## PARTIES, JURISDICTION, AND VENUE

1.      Baylor admits that Doe was a student at Baylor during the 2017-2018 academic year and that during that time, she lived in Waco, McLennan County, Texas.  Baylor lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations regarding Doe's current residence in Paragraph 1 of the Complaint.

2.      Baylor admits that it is a private educational institution located in Waco, Texas; that it may be served with process through its president; and that it receives federal funds.

3.      Baylor admits that the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(a).  Baylor denies that 28 U.S.C. § 1343 is applicable or that there is jurisdiction pursuant to this statute.

4.      Paragraph 4 contains conclusions of law, and not factual allegations that Baylor is

---

[2] *See* http://www.big12sports.com/attachments1/files/10410/639327.pdf at 45-46.

required to admit or deny.  To the extent that Paragraph 4 contains allegations that Baylor, or any of its officers, directors, trustees, representatives, agents, servants, and employees engaged in illegal or unlawful conduct, or that Baylor authorized, approved or ratified such conduct, those allegations are denied.

5.      Baylor admits that venue is proper but denies that it engaged in any illegal or unlawful conduct that would support Plaintiff's claims.

## III.
## FACTS

### A.      Baylor's Knowledge of the Risk of Sexual Assault on Campus

6.      Baylor admits that Doe was a freshman at Baylor in the fall of 2017 but denies the remaining allegations of Paragraph 6 of Plaintiff's Complaint.

7.      Baylor admits that Doe reported an incident of alleged sexual assault to its Title IX office in November 2017.  Baylor denies the remaining allegations in Paragraph 7 of the Complaint.

8.      Baylor admits that its football team lost every Big 12 conference game in 2007.  Baylor admits that Art Briles was hired in 2008 to coach the football team.  Baylor admits that it invested resources in the football program.  Baylor denies the remaining allegations in Paragraph 8 of the Complaint.

9.      Baylor admits that in 2011 the football team won the Alamo bowl and one of its players won the Heisman trophy.  Baylor further admits that in 2011 its football team ended the season with a Top 25 ranking.  Baylor further admits that by the fall of 2014 it had built and opened McLane Stadium at a cost of approximately $266 million.  Baylor further admits that in the 2015 preseason rankings it was ranked fourth in the nation in some polls.  Baylor admits that, with the move from its old stadium to the new McLane Stadium in 2014, it was a "new era" for Baylor football.

10.      Baylor denies the allegations in Paragraph 10 of the Complaint.

11.     Baylor denies that Tevin Elliott was "cited for a misdemeanor sexual assault." Baylor further denies that senior administrators and athletic personnel had known of a sexual assault allegation in October 2011. Baylor admits that in November 2011, the Waco Police Department issued a citation to Elliott for a "Class C assault," based on an allegation that Elliott poked a non-Baylor student with a broom and pinned her against a wall in her apartment. Baylor admits that Elliott was ultimately alleged to have sexually assaulted four women in addition to the Class C Assault described above, between October 2009 and April 2012. Baylor admits that Elliott was arrested on a charge of sexual assault on April 30, 2012 and expelled the next month. Baylor denies that Elliott remained on campus "a month" after the arrest, as final exams ended on May 8, 2012; Elliott was suspended prior to the beginning of the summer session. Baylor admits that former Baylor President Ken Starr lifted a suspension of Elliott for plagiarism in 2011 but denies that it was in any way related to any alleged sexual assault. Baylor admits that Elliott was convicted on two counts of sexual assault of one woman in 2014 and sentenced to 20 years in prison. Baylor denies the remaining allegations in Paragraph 11 of the Complaint.

12.     Baylor admits that *Texas Monthly* published an article in August 2015 entitled "Silence at Baylor." Baylor further admits that Baylor football transfer Sam Ukwuachu was indicted in June 2014 for the alleged sexual assault of a former Baylor soccer player. Baylor further admits that Ukwuachu transferred from Boise State. Baylor further admits that Ukwuachu was convicted of sexual assault and sentenced to 6 months in prison and 10-years' probation in August 2015, and that he is currently appealing his conviction. Baylor further admits that, prior to his trial and conviction, a Baylor student conduct official investigated the complaint against Ukwuachu in 2013 and found insufficient evidence to hold him responsible for the alleged sexual assault. Baylor denies the remaining allegations in Paragraph 12 of the Complaint.

13.     Baylor denies that it received a report in April 2013 that Armstead and Chatman were accused of rape.  Baylor admits that an officer with the Waco Police Department spoke with the Baylor police dispatcher regarding an off-campus "incident" involving three unidentified men, but the complainant would not provide any information to the police.  Baylor did not receive a report of rape against Armstead and Chatman until the fall semester of 2015, after the complainant's graduation from Baylor.  Upon receipt of the report, Baylor promptly investigated the matter and ultimately expelled Armstead.  Baylor admits that Chatman left Baylor in 2013, after the spring semester and before Baylor was aware of the alleged sexual assault.  As to footnote 1, Baylor admits that athletic recruiting was supported in part by the Baylor Bruins, a student organization that was largely female and one of whose functions was to host recruits and their families while they were on campus.  Baylor denies the remaining allegations in Paragraph 13 of the Complaint, including those in footnote 1.

14.     Baylor admits that several Baylor students have filed suits asserting Title IX claims against the University, including a suit by a former Baylor volleyball player who alleged that she was drugged and gang-raped by Baylor football players in 2012.

15.     Baylor admits the allegations in Paragraph 15 of the Complaint.

16.     Baylor admits that Richard Willis is a former Baylor Regent and served as Chair of the Board of Regents between 2012 and 2016.  Baylor further admits that Willis and his wife were lead donors for the Willis Family Equestrian Center in 2006.  Baylor denies the remaining allegations in Paragraph 16 of the Complaint.

17.     Baylor admits that two individuals have executed declarations alleging that Willis made inappropriate sexist and racist comments during a trip unrelated to Baylor in 2014, allegations that Willis has publicly denied.  Baylor admits the alleged statements are deeply offensive.  Baylor denies the remainder of the allegations in Paragraph 17 of the Complaint.

18.     Baylor denies the allegations in Paragraph 18 of the Complaint.

19.     Baylor denies the allegations in Paragraph 19 of the Complaint.  Well before 2014, Baylor took significant steps to comply with Title IX and the shifting guidance on its implementation. Just from 2010 to 2014, those steps included but were not limited to the following:

- In the fall semester of 2010, Baylor's student life division created a sexual assault work team to study and recommend improvements to policies and to develop prevention programming. The work team was expanded to include representatives from Judicial Affairs, Baylor police, and Campus Living & Learning. Its activities included, for example, developing sexual assault protocols for counselors.

- In 2010, residence hall directors attended a program called "Behind Closed Doors" and received information on resources for sexual assault victims from the medical director of Baylor Health Services.

- In 2011, anti-sexual violence programming included, for example, training for community leaders (CLs); a "Take Back the Night" program in March 2011; and a campus sexual assault prevention forum in October 2011.

- In 2012, the Student Conduct Administration Office began distributing a "Know Your Rights" hand-out summarizing student rights and options under Title IX and providing contact information for Baylor's Title IX coordinator.

- In 2012, residence hall directors attended a training program entitled "The Realities of Sexual Assault."

- In June 2013, Baylor's president established a Title IX Administrative Sexual Assault Task Force to conduct a comprehensive review of Baylor's policies and practices relating to sexual violence.

- In September 2013, Baylor launched the "Do Something" sexual assault prevention campaign for incoming freshman. The campaign was sponsored by the Baylor Sexual Assault Advisory Board, chaired by Dr. Cheryl Wooten, staff psychologist at the Baylor Counseling Center. The campaign featured a series of "Candid Conversations" held at residence halls.

- In December 2013, Baylor's Title IX coordinator and student conduct administrators told the *Baylor Lariat* that sexual assault victims would not be punished for alcohol violations related to the assault: "When it comes to a sexual assault, we're not even paying attention to an alcohol violation. That is the least of our concerns. We're going to focus exclusively on the sexual assault."

- Baylor used different methods to inform students of sexual assault disciplinary procedures and the reporting party's right to academic and living accommodations. Students received annual notification via email of their right to file a sexual assault complaint with the Title IX coordinator.

- In 2014, Baylor retained the higher education consulting firm of Margolis Healy & Associates to assess Baylor's compliance with Title IX and Clery Act requirements. The Margolis firm found in September 2014 that Baylor had taken "significant steps" to comply with the guidance from the U.S. Office for Civil Rights but advised that the University would be better served with a more strategic, comprehensive and integrated approach to its Title IX policies and procedures. The Margolis firm made 51 recommendations, which Baylor immediately began to work on implementing, one of which was to hire a full-time, dedicated Title IX coordinator in November 2014.

- In the summer of 2014, resident learning staff received training on Title IX.

- At the 2014 Orientation, a Know Your Rights hand-out, accompanied by a cover letter from Kevin Jackson, the Vice President of Student Life, was placed in the Orientation packet for all new students.

- Upon the hiring of a full-time Title IX coordinator in November 2014, a Title IX team support structure was implemented, involving administrators from across campus, including student life, athletics, and the police department. Between the fall of 2014 and the spring of 2016, significant progress was made in implementing the Margolis recommendations.

- In 2014, thousands of students and employees received sexual violence prevention training in a variety of formats and programs.

20.    Baylor admits that, in September 2014, it hired Margolis Healy to conduct a Title IX Program Review and Clery Act Compliance Assessment and that Margolis Healy issued a report regarding that assessment in September 2014. While Margolis Healy identified several areas for Baylor to improve its Title IX compliance, Margolis Healy also noted that the University had already taken several significant steps to comply with the guidance from the U.S. Department of Education's Office of Civil Rights ("OCR"), including designating a Title IX Coordinator, providing basic level training to Title IX investigators, and providing some awareness level programming on sexual assault to students. Ultimately, the report speaks for itself and Baylor is not required to admit or deny Plaintiff's interpretation or selective reading of that report. To the extent Plaintiff's description of the contents of the Margolis Healy September 2014 Report in Paragraph 20 differs, varies, contradicts, or is inconsistent with the actual report, Baylor denies Plaintiff's allegations. As to footnote 2, Baylor admits that its annual reports of "Campus Crime & Fire Statistics" referenced no acts of forcible or

non-forcible sex offenses for the years 2008, 2009, 2010, and 2011 for the Waco campus of Baylor University and University property such as Floyd Casey Stadium and the Baylor Track Complex. Plaintiff misapprehends the Clery Act, which applies only to certain offenses occurring within "Clery geography"; Baylor is not aware of any reports of sex offenses received during those years that occurred on the "Baylor Campus" as defined by Clery geography.

21.    Baylor denies that it evidenced significant resistance toward implementing "proper federal government-mandated interim measures" that would protect complainants.  Baylor further denies that it has refused to protect victims of assault during the pendency of Title IX investigations. Ultimately, the report speaks for itself and Baylor is not required to admit or deny Plaintiff's interpretation or selective reading of that report.  To the extent Plaintiff's description of the contents of the Margolis Healy September 2014 Report in Paragraph 21 differs, varies, contradicts, or is inconsistent with the actual report, Baylor denies Plaintiff's allegations.  Baylor further notes that "federal mandates" on Title IX have shifted, and federal guidance and regulations were different in 2014 than they were in 2017.

22.    Baylor admits that it hired Patty Crawford to be its first full-time Title IX Coordinator in November 2014 but denies she was Baylor's first Title IX Coordinator.  Baylor further admits that Crawford resigned her position in October 2016.  Baylor further admits that Crawford filed a complaint with the U.S. Department of Education in September 2016.  Baylor denies that it failed to support the work of the Title IX office or engaged in any type of retaliation towards Crawford.  Baylor denies the remaining allegations in Paragraph 22 of the Complaint.  From the fall of 2014 through the fall of 2016, Baylor's Title IX efforts included (again by way of example only):

- During the 2014-2015 academic year, the Title IX Office added two full-time investigators, a full-time case manager, and two external adjudicators. In March 2016, Baylor added a dedicated training and prevention specialist. Operating expenditures for the Title IX team grew 465% between the 2014 and 2015 fiscal year.

- In 2015, the Title IX coordinator and Sexual Assault Advisory Board provided training to residence hall directors on Title IX and "Bystander Intervention" theory to prevent sexual violence.

- In February 2015, Baylor hired a Clery Act Coordinator.

- During the 2015-2016 academic year, Baylor launched the "It's On Us" campaign, which publicized the role and responsibilities of the Title IX Office, including, for example, placing awareness posters in every public restroom on campus and publishing monthly ads in the student newspaper.

- In August 2015, Baylor adopted and publicized a comprehensive new SEX DISCRIMINATION, SEXUAL VIOLENCE, AND SEXUAL HARASSMENT POLICY.

- In 2016, the Board of Regents published findings, based on an investigation conducted by the law firm Pepper Hamilton, stating that Baylor's Title IX compliance efforts during the period from 2012-2015 had been slow, uncoordinated, and ultimately deficient in light of evolving guidelines from the Department of Education. The Board found university-wide failings that impacted Baylor's ability to consistently provide a prompt and equitable response to student claims during the period under review. However, the investigation also demonstrated that some areas of concern had already been addressed prior to the investigation.

- In May 2016, Pepper Hamilton made 105 recommendations to improve Baylor's Title IX efforts, which the Board adopted in their entirety. Baylor immediately initiated a coordinated, University-wide action plan to implement the recommendations. As of May 2017, Baylor announced the 105 recommendations had been structurally complete.

23.    Baylor admits that, after the criminal conviction of Ukwuachu in August 2015, the Baylor University Board of Regents retained outside counsel Pepper Hamilton to, among other things, conduct an independent and external review of Title IX issues through the lens of specific cases. Baylor admits that the Regents released Findings of Fact to the public from Pepper Hamilton's review in May 2016. Defendant admits that, in May 2016, Pepper Hamilton made 105 recommendations to improve Baylor's Title IX efforts, which the Board adopted in its entirety, and that Baylor immediately initiated a coordinated, University-wide action plan to implement the recommendations. Baylor denies that, apart from the 105 recommendations listed in Pepper Hamilton's "Report of External and

Independent Review," there was a written "Pepper Hamilton Report." Baylor denies the remainder of the allegations in Paragraph 23 of the Complaint.

24.     Baylor admits that in May 2016 the Regents released Findings of Fact addressing Baylor's institutional response to Title IX and related compliance issues through the lens of specific cases. The findings speak for themselves and Baylor is not required to admit or deny Plaintiff's interpretation of those findings. To the extent Plaintiff's description of the contents of the Findings of Fact in Paragraph 24 differs, varies, contradicts, or is inconsistent with the actual Findings of Fact themselves, Baylor denies Plaintiff's allegations.

25.     Baylor admits that, following the release of the Findings of Fact, President Ken Starr, Coach Art Briles and Athletic Director Ian McCaw were all removed from their positions. Baylor denies that, apart from the 105 recommendations listed in Pepper Hamilton's "Report of External and Independent Review," there was a written "Pepper Hamilton Report."

26.     Baylor admits that, in March 2017, the Texas Rangers announced they were opening an investigation into allegations that Baylor mishandled sexual assault investigations. Baylor can neither admit nor deny the remainder of the allegations in Paragraph 26.

27.     Baylor admits that, in May 2017, the Baylor Board of Regents announced the structural completion of the implementation of the 105 recommendations and released a comprehensive report, called *Our Commitment. Our Response. Our Progress*, outlining Baylor's Title IX initiatives and programs. Baylor further admits that, by May 2017, among other things, Baylor had accomplished all of the following:

- A Chief Compliance Officer with responsibility for Title IX and other federal and state regulatory standards had been named.

- The staff of Baylor's Title IX Office had been expanded, including the hiring of a full-time training and prevention coordinator, and the office had grown into one of the largest in the Big 12.

- A new Title IX policy, informed by leading experts in the field, had been approved, implemented and distributed to all faculty, staff and students.

- An amnesty provision was incorporated into the Title IX policy to break down potential barriers to reporting, and an online, confidential reporting tool was launched.

- Mandatory training for faculty, staff and first-year students was completed, and additional training for upper-division students had been provided.

- The staff of Baylor's Counseling Center had doubled in size; trauma-informed training and PTSD treatment training had been completed among the counseling center staff; physical space for the counseling center had almost tripled; and new specialists to assist with trauma recovery had been hired.

- A full-time Clery coordinator had been named and more than 600 employees designated as Campus Security Authorities (CSA) had been identified and trained to reinforce Clery Act reporting obligations.

- The University President had begun to hold monthly meetings with key administrators to monitor compliance in all areas of the University.

- Baylor police officers had each completed an average of 100 hours of training – more than twice the number of hours required by the Texas Commission on Law Enforcement. Included in BUPD training is 32 hours of in-service training to cover Title IX and the Clery Act. Investigators had completed the Texas Sexual Assault Family Violence Investigators Certification Course and the Victim-Centered Interviewing and Forensic Interviewing Course.

Baylor admits that an article was published in Summer 2017 that stated that "Students engaged in a Title IX report experience a consistent and equitable policy that addresses sexual and gender-based harassment and violence, dating violence, domestic violence and stalking."  Baylor denies the remaining allegations in Paragraph 27.

28.     Baylor lacks sufficient information or knowledge to form a belief about the truth of the allegations in Paragraph 28 regarding what Doe or her family relied on or understood.

29.     Baylor denies the allegations in Paragraph 29 of the Complaint.

30.     Baylor denies the allegations in Paragraph 30 of the Complaint.

31.     Baylor admits that, in February 2017, the Big 12 announced that it would be retaining an outside party to verify the implementation of the 105 recommendations made by Pepper Hamilton

in May 2016.  Baylor further admits that the Big 12 announced at that time that it would withhold 25% of future revenue distribution to the school until the completion of the outside review.  On October 30, 2018, the Big 12 announced that it would fine Baylor $2 million "for reputational damages to the conference and its members."  Baylor denies that, apart from the 105 recommendations listed in Pepper Hamilton's "Report of External and Independent Review," there was a written "Pepper Hamilton Report."  Baylor denies the remainder of the allegations in Paragraph 31 of the Complaint.

32.     Baylor admits that the firm retained by the Big 12 issued its Report on Verification of Implementation of 105 Recommendations by Baylor University (the "Big 12 Report") on August 31, 2018.  Baylor denies that the Big 12 report documented a "shocking amount of disarray" in Baylor's Title IX office at any time, or during the time of Doe's alleged assault.  Rather, the Big 12 Report found Baylor's Title IX staff to be experienced, sufficiently trained, and tasked appropriately (including the separation of the support and investigation functions) to perform their respective Title IX responsibilities.  Ultimately, the Big 12 Report speaks for itself and Baylor is not required to admit or deny Plaintiff's interpretation or selective reading of that report.  To the extent Plaintiff's description of the contents of the Big 12 Report in Paragraph 32 differs, varies, contradicts, or is inconsistent with the actual report itself, Baylor denies Plaintiff's allegations.

33.     Baylor admits that the Big 12 noted that, "contrary to Title IX's regulatory mandate" that each covered school designate an employee to serve as its Title IX Coordinator, Baylor contracted with an outside law firm in November 2017 to have one of its attorneys serve as the Title IX Coordinator while it was searching for a replacement full-time coordinator after the individual who had been in the full-time coordinator position until November 2017 took a leave of absence.  Baylor admits that it retained Maureen Holland, an experienced Title IX attorney from the firm of Cozen & Connor, to serve as Interim Title IX Coordinator until Baylor hired Dr. Laura Johnson as its full-time coordinator in April 2018.  Dr. Johnson actually assumed the position on June 1, 2018.  While Ms.

Holland's primary residence was not in Waco, she was physically present on the Baylor campus for the majority of each week, and she was integrally involved with the Title IX office on a daily basis to ensure that the office was operating in an appropriate manner and sufficient to meet the needs of Baylor and its student body. Importantly, the Big 12 does not document any deficiency in Baylor's Title IX operations as a result of Ms. Holland serving as the Interim Title Coordinator during this period of time. Ultimately, the Big 12 Report speaks for itself and Baylor is not required to admit or deny Plaintiff's interpretation or selective reading of that report. To the extent Plaintiff's description of the contents of the Big 12 Report in Paragraph 33 differs, varies, contradicts, or is inconsistent with the actual report itself, Baylor denies Plaintiff's allegations.

34.    Baylor admits that, in August 2018, the Administrative Assistant position in its Title IX office was temporarily vacant but subsequently filled in October 2018. Baylor further admits that it had budgeted to add a third full-time Title IX investigator to its staff in August 2018, but that position was not filled at the time the Big 12 Report was issued. However, as noted in the Big 12 Report, in 2017 and 2018, Baylor's Title IX staff included a Deputy Title IX Coordinator, two full-time Title IX investigators, a Coordinator for Student Support Services and an Administrative Manager and Assistant to the Title IX Coordinator. In addition, Baylor used, and still uses, external investigators (professionals who are trained on Title IX issues and Baylor's policies and procedures), as necessary, to supplement and assist its two internal Title IX investigators, depending upon case loads and the subject matter of the complaint. Baylor denies the remainder of the allegations in Paragraph 34 of the Complaint, including the allegation that Baylor did not have a full-time Title IX Coordinator until June 2018.

35.    Baylor lacks sufficient information or knowledge to form a belief about the truth of the allegations in Paragraph 35 of the Complaint regarding what Doe relied on and understood.

36.     Baylor admits that Doe was a student at Baylor beginning classes in August of 2017 and reported her sexual assault approximately three months later in November 2017.

37.     Baylor denies that, apart from the 105 recommendations listed in Pepper Hamilton's "Report of External and Independent Review," there was a written "Pepper Hamilton Report." Baylor denies the remaining allegations in Paragraph 37 of the Complaint.

## A.     The Underlying Sexual Assault

38.     Baylor lacks sufficient information or knowledge to form a belief about the truth of the allegations in Paragraph 38 of the Complaint.

39.     Baylor lacks sufficient information or knowledge to form a belief about the truth of the allegations in Paragraph 39 of the Complaint.

40.     Baylor admits that Doe attended a gathering the evening of November 11, 2017 at an apartment at University Parks, a complex owned by Baylor University.  Baylor further admits that four fellow female equestrian team members lived in the apartment, including Respondent 4.  Baylor further admits that Respondent 3 was at the gathering.  Baylor admits that the gathering lasted from approximately 8:00 p.m. to 11:00 p.m.  Baylor further admits that Doe reported to Title IX investigators that she drank a vodka and Gatorade mix and two or three shots of UV Blue Vodka during the gathering.  Baylor further admits that Doe told Title IX investigators, among other things, that "I knew I was drunk…I think I felt pretty intoxicated for awhile."  Baylor further admits that Doe told Title IX investigators that "[I drank] a little more than I normally would."  Baylor denies the remainder of the allegations in Paragraph 40 of the Complaint.

41.     Baylor admits that, at approximately 11:00 p.m., Respondent 4, the designated driver who was not drinking, drove Doe and 6 other students, male and female, to Scruffy Murphy's, a bar in Waco.  Baylor admits that Doe stayed at the bar for several hours and danced.  Baylor further admits

some witnesses reported that Doe and another female student-athlete seemed intoxicated at the bar. Baylor denies the remainder of the allegations in Paragraph 41.

42.     Baylor admits that Respondent 4, a female student athlete, drove Doe and several other male and female student-athletes, including Respondent 3, from the bar to Respondent 4's apartment, which she shared with three other female student-athletes.  Respondent 4 was not drinking and sober at the time.  Baylor further admits that one witness reported that she observed Doe stumbling on the dance floor at the bar, but others reported that Doe did not have difficulty walking or trouble with her balance.  Baylor further admits that some witnesses reported that Doe and another of the female student-athletes exhibited signs of being intoxicated at the bar.  Baylor denies the remainder of the allegations in Paragraph 42.

43.     Baylor admits that, after the group arrived at the apartment, Respondent 1 left and walked back to his apartment in the same complex and took a shower.  Baylor further admits that Respondent 2 reported that he met up with Respondent 1 and walked with him to Respondent 4's apartment where several of the group, including Doe, were gathered.  Baylor denies the remainder of the allegations in Paragraph 43 of the Complaint.

44.     Baylor admits that Respondent 2 and 3 were found responsible for one or more violations of Baylor's Title IX Policy prohibiting non-consensual sexual penetration and/or non-consensual sexual contact of a fellow female student-athlete by virtue of her incapacitation.  Baylor further admits that Respondent 3 was found responsible for a violation of Baylor's Title IX Policy prohibiting non-consensual sexual penetration as to Doe because she withdrew her consent to the sexual activity and not because she was incapacitated.  Baylor denies the remainder of the allegations in Paragraph 44 of the Complaint.

45.     Baylor denies that Respondent 1 either videotaped the alleged sexual assault or was in the room when the alleged sexual assault occurred.  Baylor admits that Respondent 1 videotaped

several couples kissing, including Doe, at Respondent 4's apartment.  Baylor further admits that Respondent 1 videotaped Doe kissing another female student-athlete at the apartment.  Baylor further admits that Respondent 1 posted one or more of the above videos on a freshman football Snapchat group.  Baylor further admits that Respondent 1 sent Respondent 4 one or more of the above videos and that Respondent 4 showed the videos to others, including members of the equestrian team.  Baylor denies the remainder of the allegations in Paragraph 45 of the Complaint.

46.     Baylor admits that Doe slept at the apartment in one of her friend's bedrooms in the early morning hours of November 12, 2017.  Baylor denies the remainder of the allegations in Paragraph 46 of the Complaint.

47.     Baylor admits that Doe reported that, when she woke up the next morning, she spoke with a few of the people who had been at the gathering the night before.  Baylor admits that, by that time, Respondent 1 had shown the videos to several people and Respondent 4 had shown the video to at least one person. Baylor denies the remainder of the allegations in Paragraph 47 of the Complaint.

48.     Baylor admits that some upper-class equestrian team members learned of the incident. Baylor further admits that Doe reported that at least one of the team members had called Doe and the other female student-athletes involved in the incident "sluts." Baylor is without sufficient information or knowledge to admit or deny whether Doe was fearful she would be disciplined by the equestrian team coach, Casie Maxwell.  Baylor admits that Respondent 4 was ultimately found responsible for violating Baylor's Title IX Policy.  Baylor denies the remainder of the allegations in Paragraph 48 of the Complaint.

49.     Baylor is without sufficient information or knowledge to admit or deny Doe's mental state as to when she began to believe she was the victim of a sexual assault.  Baylor admits that Doe met with Coach Maxwell and Nancy Post from the Athletics Department on November 14, 2017. Baylor admits that Maxwell and Post informed Doe that they would have to report the incident to

Title IX.  Baylor further admits that Maxwell accompanied Doe to the Baylor Counseling Center that same day and that a counselor at the center assisted Doe in making an appointment with Title IX for the next day, November 15.  Baylor denies the remainder of the allegations in Paragraph 49 of the Complaint.

50.     Baylor admits that Respondent 4 is reported to have said to one of the female student-athletes involved in the incident that Baylor football might receive the death penalty if she reported what happened to her.  Baylor is without sufficient information or knowledge to admit or deny Doe's mental state as alleged in Paragraph 50.

**B.    Doe's Report to Baylor's Title IX Office**

51.     Baylor admits that Baylor's Title IX Coordinator was immediately informed of the incident after it came to the attention of athletics officials and subsequently informed personnel in the Office of General Counsel.  Baylor further admits that, at the encouragement of Coach Maxwell, her equestrian coach, and the Baylor counseling center, Doe made a report to Title IX on the afternoon of November 15, 2017, just four days after the incident.  Baylor denies that it failed to implement interim measures following the report of the incident.  On November 20, 2017, Baylor issued No Contact Directives to Respondents directing them not to have any contact with Doe or the other complainants involved in the incident.  In addition, Doe asked for and received an academic accommodation in the days following the incident.  Baylor did not postpone interviews.  Baylor worked with the three complainants from the incident, including Doe, to schedule interviews in a time and manner convenient for them in consideration of the Thanksgiving holidays and other circumstances involved.  Baylor denies the remainder of the allegations in Paragraph 51 of the Complaint.

52.     Baylor admits that Michael Noble, a full-time Title IX investigator at Baylor, and Lee Ann James, an outside attorney, were assigned to investigate the complaint of Doe and two other

female student-athletes against four different individuals regarding the events of November 11 and 12, 2017. Baylor further admits that Doe was interviewed on November 30, 2017, although Title IX had communicated with Doe and her father on several occasions prior to the interview on November 30. Baylor admits that it issued a Notice of Investigation on January 18, 2018 after conducting initial interviews with all three of the complainants to determine the appropriate charges to be investigated, interviews that were scheduled to accommodate the student's requests in connection with Thanksgiving break, final exams, and Winter Break. Baylor further admits that Title IX investigators interviewed Doe again on March 14, 2018 and again, at her request with her attorney, on April 16, 2018. Baylor denies the remainder of the allegations in Paragraph 52 of the Complaint.

53. Baylor denies that either federal regulations or its own policies and procedures require Baylor to complete an investigation of sexual assault within 60 days. Baylor admits that, while its policies provide that it will seek to complete the investigation and resolution within 60 days, that time-frame may be extended to preserve the thoroughness and integrity of the investigation. The 60-day time frame may further be extended depending upon the complexity of the case; the severity of the violations alleged; intervening breaks in the University calendar; University finals; and requests for delay from the parties involved. In this instance, it was a complex case involving three complainants, four respondents, and serious allegations of sexual assault and exploitation. In addition, the case involved numerous witnesses. Further, the incident happened shortly before Thanksgiving break, straddled Winter break and two University finals periods, as well as a Summer break. Finally, the investigation was further delayed by numerous requests by some of the Complainants for additional time to schedule interviews and review reports. Baylor admits that Title IX completed its Final Investigative report by September 2018, at which time all of the Respondents had permanently withdrawn from the University. Baylor admits that the review and sanction process was finalized as to three of the Respondents in October 2018 and as to a fourth Respondent in February 2019. None

of the Complainants, including Doe, or the Respondents attended the University after the Spring of 2018. Baylor denies the remainder of the allegations in Paragraph 53 of the Complaint.

**C.     Baylor's Delayed and Insufficient Title IX Process**

54.     Baylor is without sufficient information or knowledge to admit or deny the allegations regarding Doe's mental state in Paragraph 54 of the Complaint. Baylor denies that it unduly delayed investigating Doe's Title IX complaint or failed to communicate with her regarding the status of her complaint and efforts to protect her from any adverse action by the Respondents or others during the pendency of the investigation. In fact, Baylor Title IX representatives and later, an attorney in Baylor's Office of General Counsel, were in near constant communication with Doe, her father and later her attorney, Patricia Davis, regarding the status of the investigation, interim measures enacted by the University to limit contact between Doe and the Respondents, and regarding academic accommodations for Doe. Baylor denies the remainder of the allegations in Paragraph 54 of the Complaint.

55.     Baylor admits its neutral investigators gathered pertinent, factual information from relevant parties and witnesses. Baylor further admits that Doe, as the complaining party, offered her perspective of the incident and was free to ask any questions she may have had. Baylor denies the remaining allegations in Paragraph 55 of the Complaint.

56.     Baylor admits that Noble asked detailed questions of Doe, the other female student-athletes involved in the incident, and the Respondents regarding the events of the night in question, including questions regarding the specific sexual acts that were alleged to have occurred and to be non-consensual. Baylor denies that Noble asked the questions in a shaming, embarrassing or hostile manner. Noble asked detailed questions to enable the investigators to reach a reasoned finding on the critical question of whether the sexual activity had been consensual not just between Doe and two of the Respondents but also as to the other female student-athlete and two of the Respondents.

Further, Noble has received specific trauma-informed investigation training on how to conduct Title IX interviews of complainants. Ultimately, the interviews of Doe were transcribed and videotaped and will speak for themselves. To the extent that Doe's allegations in Paragraph 56 of what occurred and was said during the interviews varies, differs or is incomplete from what is reflected in the transcript and videotape of the interviews, Baylor denies the allegations. Baylor lacks information and knowledge sufficient to admit or deny Doe's mental state during the interview with Noble and James. Baylor denies the remainder of the allegations in Paragraph 56 of the Complaint.

57.     Baylor denies the allegations in Paragraph 57 of the Complaint.

58.     Baylor lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 58 of the Complaint, although both Noble and James deny engaging in any behavior intended to confuse Doe, or make her anxious or depressed. To the extent Paragraph 58 alleges that James, Noble or Baylor engaged in any inappropriate or unlawful behavior, Baylor denies the allegations.

59.     Baylor admits that Baylor's *Sexual and Gender-Based Harassment and Interpersonal Violence Policy* (the "Policy") in effect at the time of Doe's Title IX Complaint contained some of the above quotes but denies that Paragraph 59 is a complete or wholly accurate recitation of the definition of "Consent" in the Policy. Ultimately, the Policy speaks for itself and to the extent Doe's description of the definition of "Consent" in the Policy varies, differs or is incomplete with the definition of "Consent" in the Policy, Baylor denies the allegations in Paragraph 59 of the Complaint.

60.     Baylor admits that Doe told the investigators that she was intoxicated the evening of the incident but denies that she initially reported she was so intoxicated that she could not give consent to any of the activity. Baylor admits that later, by the third interview with her attorney present, Doe told investigators that she was too intoxicated to consent to sexual activity. Baylor admits that some witnesses described Doe as intoxicated earlier in the evening but denies that all witnesses described

Doe at the same level of intoxication even during that time.  Baylor denies that Noble attempted to make Doe admit that she had consented to the sexual activity.  Ultimately, the interviews of Doe were transcribed and videotaped and will speak for themselves.  To the extent that Doe's allegations in Paragraph 60 of what occurred and was said during the interviews vary, differ or are incomplete from what is reflected in the transcript and videotape of the interviews, Baylor denies the allegations.  Baylor denies the remainder of the allegations in Paragraph 60 of the Complaint.

61.     Baylor admits that, because Doe previously reported that she had consented to certain sexual activity with Respondent 3, Noble asked Doe how forcefully she later told Respondent 3 to stop the same activity.  Baylor further admits that Noble asked Doe whether she thought Respondent 3 understood that he should stop the activity and not attempt to do it again.  Noble and James subsequently concluded that Doe had withdrawn her consent to the sexual activity and found Respondent 3 responsible for a violation of Baylor's Title IX Policy by virtue of his non-consensual contact and/or penetration of Doe after she had withdrawn her consent.  Ultimately, the interviews of Doe were transcribed and videotaped and will speak for themselves.  To the extent that Doe's allegations in Paragraph 61 of what occurred and was said during the interviews vary, differ or are incomplete from what is reflected in the transcript and videotape of the interviews, Baylor denies the allegations.  Baylor denies the remainder of the allegations in Paragraph 61 of the Complaint.

62.     Baylor denies that Noble and James "attempted to have Doe say that she told people that she was raped only because she was embarrassed that the incident had been videotaped."  Baylor denies that Noble and James "manipulated [Doe's] words and her mental state to try to get Doe to affirm she consented to some of the acts."  Ultimately, the interviews of Doe were transcribed and videotaped and will speak for themselves.  To the extent that Doe's allegations in Paragraph 62 of what occurred and was said during the interviews vary, differ or are incomplete from what is reflected

in the transcript and videotape of the interviews, Baylor denies the allegations.  Baylor denies the remainder of the allegations in Paragraph 62 of the Complaint.

63.     Baylor lacks sufficient information or knowledge to admit or deny what Doe "thought" about the investigators.  Baylor admits that Doe requested a third interview with the Title IX investigators.  Baylor further admits that, on April 16, 2018, the Title IX investigators interviewed Doe with her counsel, who requested to be present during the interview.  Doe further admits that Doe subsequently submitted a written statement to the investigators.  Baylor denies the remainder of the allegations in Paragraph 63.

64.     Baylor admits that the Title IX investigators, Noble and James, concluded that there was insufficient evidence, by a preponderance, to support a finding that Respondent 2 or Respondent 3 subjected Doe to sexual contact or penetration at a time that when they knew, or should have known, that she was incapacitated.   Noble and James also concluded, however, that Doe had withdrawn her consent to the sexual activity with Respondent 3 and ultimately found Respondent 3 responsible for a violation of Baylor's Title IX Policy by virtue of his non-consensual contact and/or penetration of Doe after she had withdrawn her consent.  Baylor denies the remainder of the allegations in Paragraph 64 of the Complaint.

65.     Baylor admits that it issued No Contact Directives to all of the Respondents involved in the incident on November 20, 2017.  Further, all of the Respondents were immediately suspended from the ability to play and practice their sports.  Baylor further admits that, following the incident on November 11-12, Doe asked for and received academic assistance but when asked if she needed additional assistance, Doe said she did not need any more assistance at that time.  Baylor denies the remainder of the allegations in Paragraph 65 of the Complaint.

66.     Baylor lacks information and knowledge sufficient to admit or deny what Doe thought she "knew."  Baylor admits that Doe and Respondents lived in the same apartment complex but denies

that they lived "within yards" of each other.  Further, Doe previously rejected any accommodation for living arrangements.  While Doe and Respondents shared a dining hall (the "BANC") and training facility, as well as a study hall ("Highers"), athletic officials coordinated with Title IX in early 2018 to schedule the three Complainants, including Doe, and Respondents such that they would not overlap and see each other.  Baylor denies the remainder of the allegations in Paragraph 66 of the Complaint.

67.     Baylor admits that on December 1, 2017, Doe sent an email to the Title IX Coordinator and Noble advising that she had been eating lunch with some friends at the Student Union Building when she saw Respondent 1 come from a different area of the building and sit at a table close to her table.  Doe further advised that, when she moved to a different table outside, Respondent 1 also moved outside and sat at a table close to her table.  When Title IX offered to speak to Respondent 1 about the incident, Doe said she was unsure if the incident was intentional and said that she did not want any follow up at that time.  Baylor denies the remainder of the allegations in Paragraph 67 of the Complaint.

68.     Baylor admits that, within days of the incident, the Respondents were suspended and unable to play or practice with the football team, attend team meetings or work out at the athletic training facility.  Baylor further admits that Respondents subsequently had to follow adjusted schedules for eating meals in the BANC following a report by Doe that Respondent violated the No Contact Directive at the BANC.  Respondent 1 was subsequently banned from eating at the BANC when he violated the adjusted schedules.  Baylor further admits that none of the Respondents were entitled to attend their end-of-the-year banquets for student-athletes.  Baylor admits that Respondents were allowed to remain in their University Parks apartments.  Baylor denies the remainder of the allegations in Paragraph 68 of the Complaint.

69.     Baylor admits that Doe and Respondents both attended Highers during the pendency of the investigation but denies that Baylor did nothing to minimize any overlap between Doe and

Respondents at the facility.  In fact, Baylor had previously adjusted tutoring and study hall times to ensure Doe and the Respondents were not at Highers at the same time; examined class schedules to identify and eliminate potential encounters; and provided alternative space for tutoring sessions during peak crossover hours.  Baylor admits that it never completely banned Respondents from Highers during the pendency of the investigation.  Baylor admits that, when Doe first raised a concern about encountering one of the Respondents at Highers, an encounter that occurred because of a request for a new tutor appointment by Doe, Baylor established a more formal schedule for the Complainants, including Doe, and Respondents to attend Highers.  Baylor admits that Doe was allowed two hours per week under the schedule while Respondents received additional hours of tutoring.  Respondents received additional hours based on academic need.  Baylor informed Doe that, if she required additional tutoring (which she historically had not), all she would  need to do is request it and she would be provided with additional or alternative times.  Baylor denies the remainder of the allegations in Paragraph 69 of the Complaint.

70.     Baylor admits that for several months, the Complainants and Respondents in the incident were allowed to eat in the BANC as long as Respondents abided by the No Contact Directive. In late March, Doe reported a potential violation by Respondents of the No Contact Directive in the BANC.  As a result of Doe's report, Athletics implemented a more formal schedule whereby Respondents would eat at certain times and Complainants would eat at other times, thereby eliminating any overlap.  Baylor further admits that, when Respondent 1 subsequently violated the schedule, he was banned from the BANC during the pendency of the investigation.  Baylor denies the remainder of the allegations in Paragraph 70 of the Complaint.

71.     Baylor admits that, in late March, Doe reported a potential violation by Respondents of the No Contact Directive in the BANC.  As a result of Doe's report, Athletics implemented a more formal schedule whereby Respondents would eat at certain times and Complainants would eat at other

times, thereby eliminating any overlap.  Baylor further admits that, when Respondent 1 subsequently violated the schedule, he was banned from the BANC during the pendency of the investigation. Baylor denies the remainder of the allegations in Paragraph 71 of the Complaint.

72.     Baylor admits that, due to the number of Complainants, Respondents, witnesses, and allegations, it interviewed numerous people as part of its investigation but denies that it unnecessarily questioned anyone.  Baylor further denies that the investigators unnecessarily disclosed any private information about Doe as part of their investigation.  Baylor denies the remainder of the allegations in Paragraph 72 of the Complaint.

73.     Baylor denies that it did anything to prompt national news stories about the incident on November 11-12, 2017.  By the time Coach Rhule confirmed the suspension of the Respondent football players at a pre-spring press conference as part of a greater roster update in March 2018, media had already obtained information about the incident through independent means, such as Freedom of Information Act requests for the relevant police report of the evening in question.  Baylor further denies that national media were ever provided access to the equestrian team barn and team only facility.  Baylor admits that an individual local media outlet somehow was alerted to a private equestrian team meeting but denies that it allowed the press to obtain any information that was discussed in the meeting.  Baylor admits that Doe raised concerns about media but denies that it did anything to subject Doe to media scrutiny.  In fact, just the opposite.  Baylor did everything it could to safeguard the privacy of Doe and the other students involved in the process.  Baylor denies the remainder of the allegations in Paragraph 73 of the Complaint.

74.     Baylor denies the allegations in Paragraph 74 of the Complaint.

75.     Baylor lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 75 regarding Doe's mental state but denies that it failed to take action to support Doe during the pendency of the investigation. Baylor was in constant contact with Doe, her father, or her

counsel throughout the entire process.  Among other things, Baylor implemented  interim measures designed to limit contact between Doe and Respondents, as well as provided the opportunity for counseling services and academic support to Doe throughout the process.  Baylor denies the remainder of the allegations in Paragraph 75 of the Complaint.

76.     Baylor admits that it did not remove Respondents from campus during the pendency of the investigation, but it did make every effort to minimize contact between Doe and Respondents by issuing No Contact Directives, establishing separate BANC and Highers' schedules, and pro-actively addressing potential class overlap with the students.  Baylor denies the remainder of the allegations in Paragraph 76 of the Complaint.

**D.     Baylor's Deliberate Indifference and Retaliation in Response to Doe's Complaint**

77.     Baylor admits that, on April 5, 2018, Doe's counsel sent an email and letter to Holland (on which President Linda Livingstone was copied) setting forth her concerns with the Title IX investigation to date.  Baylor further admits that the very next day, Baylor sent a response to the April 5 letter stating "Thank you for raising your concerns about the investigation.  Please be advised we are looking into the matters raised in your email and revised letter.  In the meantime, the Title IX process will continue as set forth in Baylor's policy."  As set forth in Paragraph 53, Baylor denies that its policy "required" the process to have been completed three months earlier or that it acted contrary to its Policy in any respect. To the extent that Paragraph 77 alleges that Baylor, or any of its representatives, engaged in any improper or unlawful conduct, those allegations are denied.

78.     Baylor admits that, on May 11, 2018, Doe's father wrote a letter to President Livingstone recounting Doe's decision to enroll at Baylor and be a member of the equestrian team. The May 11 letter also acknowledged Doe's father and his wife had concerns about the athletic program and sexual assaults and "wanted to believe that the new football and equestrian coaches would transform their programs and make it a safe place for student-athletes like [Doe]."  To the

extent that Paragraph 78 alleges that Baylor, or any of its representatives, engaged in any improper or unlawful conduct, those allegations are denied.

79.     Baylor admits that the May 11, 2018 letter by Doe's father cites his complaints about Baylor's Title IX investigation.  Baylor expressly denies that Baylor, or any of its representatives, engaged in any improper or unlawful conduct, as reflected in Paragraph 79 of the Complaint.

80.     Baylor admits that President Livingstone responded to Doe's father on June 1, 2018 with genuine concern for Doe, including offering appropriate accommodations for Doe, in addition to her thoughts and prayers, and addressed Doe's father's frustration over the length of time of the investigation "given the number of witnesses involved and the volume of information that has been obtained as part of the Title IX investigation."  To the extent that Paragraph 80 alleges that Baylor, or any of its representatives, engaged in any improper or unlawful conduct, those allegations are denied.

81.     Baylor lacks knowledge or information sufficient to admit or deny why Doe believed she needed to leave Baylor or her mental state at the time she withdrew from Baylor.  To the extent that Paragraph 81 alleges that Baylor, or any of its representatives, engaged in any improper or unlawful conduct, those allegations are denied.

82.     Baylor admits that Doe wrote a letter to President Linda Livingstone on July 31, 2018 that contained the quoted language in Paragraph 82.  To the extent that Paragraph 82 alleges that Baylor, or any of its representatives, engaged in any improper or unlawful conduct, those allegations are denied.

83.     Baylor admits that Doe was provided a copy of the Final Investigative Report on September 12, 2018 and notified of the decision of the Title IX Review Panel regarding sanctions on October 18, 2018.  Baylor further admits that Respondent 3 was found responsible for a violation of Baylor's Title IX Policy by virtue of his non-consensual contact and/or penetration of Doe and expelled from Baylor.  Respondent 1 was found responsible for a violation of Baylor's Title IX policy

by virtue of his sexual exploitation of Doe through the distribution of the videos of the night in question.  Respondent 1 was expelled from campus.  Respondent 2 was found not responsible for any Title IX violations as to Doe but was found responsible for a Title IX violation as to one of the other female student-athletes involved in the incident and expelled.

84.     Baylor admits that Title IX suspended its investigation regarding the allegations against Respondent 4 after she voluntarily withdrew from the University.  Baylor further admits that Title IX re-opened the matter when Respondent 4 requested to re-enroll at Baylor.  Baylor further admits that Title IX ultimately found Respondent 4 responsible for a violation of Baylor's Title IX Policy prohibiting sexual exploitation by virtue of her dissemination of the intimate videos of the night in question.  Baylor lacks information or knowledge sufficient to admit or deny the allegations in Paragraph 84 regarding Doe's mental state.  To the extent that Paragraph 84 alleges that Baylor, or any of its representatives, engaged in any improper or unlawful conduct, those allegations are denied.

## IV.
## CLAIMS

### COUNT 1 – Title IX Violations

85.     Baylor incorporates by reference incorporates its responses to Paragraphs 1 through 84 as if fully set forth herein.

86.     Baylor denies the allegations in Paragraph 86 of the Complaint.

87.     Baylor denies the allegations in Paragraph 87 of the Complaint.

88.     Baylor denies the allegations in Paragraph 88 of the Complaint.

89.     Baylor denies the allegations in Paragraph 89 of the Complaint.

90.     Baylor denies the allegations in Paragraph 90 of the Complaint.

91.     Baylor denies the allegations in Paragraph 91 of the Complaint.

92.     Baylor denies the allegations in Paragraph 92 of the Complaint.

93.     Baylor denies the allegations in Paragraph 93 of the Complaint.

94.     Baylor denies the allegations in Paragraph 94 of the Complaint.

95.     Baylor denies the allegations in Paragraph 95 of the Complaint.

96.     Baylor denies the allegations in Paragraph 96 of the Complaint.

97.     Baylor denies the allegations in Paragraph 97 of the Complaint.

98.     Baylor denies the allegations in Paragraph 98 of the Complaint.

## V.
## JURY DEMAND

99.     This paragraph does not require a response.  Defendant demands a trial by jury on all issues so triable.

## DEFENSES

In asserting the following defenses, Baylor does not admit that the burden of proving the allegations or denials contained in the defenses is upon Baylor; to the contrary, the burden of proving the facts relevant to many of the defenses and the burden of proving the inverse of the allegations contained in many of the defenses is upon Plaintiff.  Moreover, in asserting any defense Baylor does not admit any liability but, to the contrary, specifically denies any and all allegations of liability in the Plaintiff's Complaint. Without admitting liability as to any of Plaintiff's causes of action, Baylor asserts the following defenses:

1.     The claim that Baylor's alleged actions and omissions created a heightened risk of sexual assault is speculative, non-justiciable, and fails to meet the Article III case and controversy requirement. This Court lacks subject matter jurisdiction over Plaintiff's claims because they have failed to allege a concrete injury in fact that is fairly traceable to Baylor's actions as opposed to the actions of a third party.

2.      To the extent that Title IX allows the Plaintiff to proceed on a theory that allows the imposition of civil liability based on sexual assaults perpetrated by third-party students in a context not under Baylor's substantial control, Title IX exceeds the scope of Congress's power under the Fourteenth Amendment and fails to provide Baylor with sufficient notice of this type of liability as required by the Spending Clause of the U.S. Constitution.

3.      To the extent Title IX allows the Plaintiff to proceed on a theory that Baylor's acts or omissions caused a heightened risk that made her vulnerable to further harassment that never in fact happened, Title IX exceeds the scope of Congress's power under the Fourteenth Amendment and fails to provide Baylor with sufficient notice of this type of liability under the Spending Clause.

4.      Plaintiff has failed to mitigate her damages by, among other things, failing to pursue civil claims and other remedies against the alleged perpetrators of the alleged assault.  Plaintiff has failed to join all parties needed for just adjudication, including her alleged assailants.

5.      The actions and omission of various third parties (including her alleged assailants) were the sole proximate cause of the alleged injuries and damages, if any, sustained by Plaintiff.

6.      To the extent that Plaintiff's Title IX claims depend on any "Dear Colleague Letter" or other sub-regulatory guidance issued by a governmental agency, such letters and guidance are nonbinding and unenforceable.  The letters and guidance were not promulgated pursuant to notice-and-comment rulemaking and are contrary to the plain language of Title IX.  Moreover, on September 22, 2017, the U.S. Department of Education rescinded the Dear Colleague Letter of April 4, 2011, and the April 29, 2014, document entitled "Questions and Answers on Title IX and Sexual Violence." The Department of Education rescinded the Dear Colleague Letter in part because it imposed "regulatory burdens without affording notice and the opportunity for public comment." See https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.      The      U.S. Department of Education has acknowledged that administrative guidance documents, issued without

notice and comment, do not have "the force and effect of law." Catherine E. Lhamon, Ass't Sec'y of Educ., Letter to U.S. Sen. James Lankford, Feb. 17, 2016, p. 2. Additionally, the U.S. Court of Appeals for the Fifth Circuit has noted that non-compliance with a Dear Colleague Letter will not support liability for damages. *See K.S. v. Northwest Indep. Sch. Dist.*, 689 Fed. App'x 780, 787 (5th Cir. 2017).

7.      Baylor exercised reasonable care to prevent and promptly correct any harassing or discriminatory conduct, and Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Baylor or to avoid harm otherwise.

8.      Plaintiff's Complaint fails to state a valid claim for violations of Title IX against Baylor due to Plaintiff's failure to plead specific facts supporting a plausible inference that Baylor was deliberately indifferent to any known sexual harassment.

## PRAYER FOR RELIEF

Defendant denies that Plaintiff is entitled to any of the relief requested. Defendant denies any and all further allegations not specifically addressed in this answer and denies that Plaintiff has stated a valid claim or is entitled to relief. Defendant Baylor University prays that the Court render judgment in favor of Defendant, dismiss all of Plaintiff's claims with prejudice, and that the Court grant any other relief to which Defendant may be entitled.

Dated: July 1, 2019

Respectfully submitted,

**WEISBART SPRINGER HAYES LLP**

212 Lavaca Street, Suite 200
Austin, Texas 78701
512.652.5780
512.682.2074 fax

By:    /s/ Julie A. Springer
        Julie A. Springer
        Texas Bar No. 18966770
        jspringer@wshllp.com
        Sara E. Janes
        Texas Bar No. 24056551
        sjanes@wshllp.com
        Mia A. Storm
        Texas Bar No. 24078121
        mstorm@wshllp.com

**ATTORNEYS FOR DEFENDANT
BAYLOR UNIVERSITY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record herein by way of:

☐ U.S. Mail, First Class
☐ Certified Mail
☐ Facsimile
☐ Federal Express
☐ Hand Delivery
☒ ECF (electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

on this 1st day of July 2019, to wit:

Julie E. Heath
Patricia H. Davis
Katie M. Ackels
FARROW-GILLESPIE HEATH WITTER, LLP
1700 Pacific Avenue, Suite 3700
Dallas, Texas 75201
214.560.5600
214.203.0651 fax
julie.heath@fghwlaw.com
patricia.davis@fghwlaw.com
katie.ackels@fghwlaw.com

**ATTORNEYS FOR PLAINTIFF**

/s/ Julie A. Springer
Julie A. Springer